In re EL CAMINO PRESS, a California corporation, Bankrupt.

Brooks IWAKIRI, Plaintiff,

v.

Carol EWING, Executrix of the Estate of Harry Engelson, Deceased, Lloyds Bank, J. Ridley Lewis Co., Carlyle Michelman, Trustee, and Robert H. Stopher, Trustee in re Hamilton Equipment Leasing Corporation, Case No. SA–80–03330 AP., Defendants.

Bankruptcy No. 79–00519–RS.
Adv. No. "L."

United States Bankruptcy Court,
C.D. California.

June 24, 1983.

Irv M. Gross, Robinson, Wolas & Diamant, Los Angeles, Cal., for defendant Carol Ewing.

David Gould, Danning, Gill, Gould, Joseph & Diamond, Los Angeles, Cal., for defendant Carlyle Michelman.

Neil H. Miller, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., for defendant Lloyds Bank.

Robert D. McIlroy, Stopher & Stuhley, Santa Ana, Cal., for defendant Robert H. Stopher, Trustee in the Bankruptcy case of Hamilton Equipment Leasing Corp.

Walda Abbott, Beverly Hills, Cal., for defendant J. Ridley Lewis Co.

Milton B. Miller, Woodland Hills, Cal., Steven H. Gardner, Cohon and Gardner, P.C., Los Angeles, Cal., for plaintiff Brooks Iwakiri.

## MEMORANDUM OF DECISION DENYING PLAINTIFF'S FIRST AMENDED COMPLAINT

RUSSELL B. SEYMOUR, Bankruptcy Judge.

### INTRODUCTION

This adversary proceeding was filed on April 9, 1982, by plaintiff Brooks Iwakiri. The Complaint alleges breach of contract, breach of warranty, interference with prospective advantage, and interference with contractual relationship. Plaintiff named as defendants Carol Ewing, Executrix of the Estate of Harry Engelson, Lloyds Bank, J. Ridley Lewis Co., Carlyle Michelman, Trustee in the bankruptcy case at bar, and Robert H. Stopher, Trustee in the bankruptcy case of Hamilton Equipment Leasing Corporation (Case No. SA–80–03330 AP).

Plaintiff alleges in his Complaint that he had a contract with the defendants to purchase a 12-pocket Muller-Martini Gathering Line (hereinafter referred to as "pockets") and that the defendants subsequently breached the contract by failing to consummate the agreed-upon sale.

Iwakiri contends also that because of defendants' intentional interference, he was unable to consummate a resale of the pockets to Real Times Systems (RTS), allegedly resulting in lost profits to him in the amount of $30,000.

### FACTS

1. On June 20, 1980, in the matter of *El Camino Press*, a California corporation (an adjudicated Chapter XI proceeding under the Bankruptcy Act), the Bankruptcy Court authorized the trustee, Carlyle Michelman, to sell the physical assets of the debtor's estate at public auction. On October 21, 1980, pursuant to the trustee's application of October 17, 1980, an order was entered authorizing the employment of Harry Engelson as auctioneer. Said order provided that all property was to be sold free and clear of liens, provided the bids exceeded the claims of lessors and secured parties.

The pockets were included among the personal property being offered at the auction.

2. Hamilton Equipment Leasing Corporation (hereinafter referred to as "Hamilton") was the original owner of the four sets of pockets. Hamilton, as lessor, leased the pockets to El Camino Press pursuant to a July 24, 1978, equipment lease. Hamilton, in turn, assigned the lease to Lloyds Bank as security for loans made by Lloyds to Hamilton.

3. On November 14, 1980, one week prior to the sale, Hamilton filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court, Central District of California. Robert R. Stopher was appointed trustee in the *Hamilton* proceeding. No order lifting the stay as to the sale of the pockets was ever granted in *Hamilton*.

4. At the outset of the auction on November 21, 1980, Engelson announced that any property subject to liens would be sold only if the bids thereon exceeded the liens; otherwise, the sale would be consummated only with the consent of the secured parties. Engelson announced also that if for any reason a sale to the highest bidder would not occur, the prospective buyer's only remedy would be the return of his 25 percent deposit.

5. At the auction sale, bidder No. 123 offered $12,000 for the pockets. The bid, which was less than the aggregate of the liens on the pockets, was accepted subject to the consent of the secured parties.

6. Defendants allege that bidder No. 123 was not Brooks Iwakiri, but American Technical Supply (ATS). Defendants contend that Iwakiri registered for the sale by presenting a business card of ATS, identifying Iwakiri as its agent. Consequently, defendants ask that the action be dismissed because Iwakiri is not a real party in interest.

7. Iwakiri contends that he was acting solely on his own behalf at the sale and that he presented an ATS card because he had left his own business cards at home.

8. Iwakiri alleges that Lloyds, Michelman, and Engelson represented to those present at the sale that Lloyds had authorized Harry Engelson Auctioneers (hereinafter referred to as "HEA") to sell the pockets free and clear of all encumbrances and that Lloyds would terminate their security interest upon the pockets being sold. Subsequently, Iwakiri bid $12,000 and delivered a blank check to HEA representing his bid. The check was never negotiated and HEA refused to surrender the pockets to the plaintiff. Subsequent to the auction, after receiving the approval of Hamilton, Lloyds sold the pockets to S. Ridley Lewis Company for $15,000.

9. Defendants allege that the drop of the hammer by Engelson did not complete the sale; and they further contend that the sale was "with reserve." Additionally, defendants allege that the plaintiff's bid was a mere offer and was not binding until both Lloyds, as holder of the security, and Stopher, as trustee of Hamilton, had consented to the sale.

10. Plaintiff contends that Lloyds was present at the sale and approved the bid. Furthermore, he contends that a contract existed at the moment Lloyds confirmed the sale and that Hamilton's consent was not required because Hamilton had assigned all of its rights as a secured party to Lloyds Bank.

11. In the alternative, plaintiff argues that should the property be part of the Hamilton estate, the sale would not be void as to Hamilton because it had only an "expectancy interest" in the sale of the pockets and, as such, the pockets were not part of the estate. Consequently, the only rights reserved by Hamilton would be those created by a surplus if any should arise out of the sale of the pockets.

## DISCUSSION

12. The case at bar presents this Court with two major issues. First, whether the plaintiff complied with the conditions of the auction sale and, secondly, assuming there was a valid sale to plaintiff, whether such a sale would be void absent a court order granting relief from the automatic stay.

13. The plaintiff's Complaint for breach of contract must ultimately succeed or fail with an initial determination as to the existence of a binding contract between the plaintiff and defendants.

14. The burden rests with the plaintiff to demonstrate that his bid at the auction sale was an effective offer which met all conditions imposed by the auctioneer and was accepted by the seller.

15. The weight of authority indicates that when an auctioneer presents an article for sale at auction and asks for bids, he is ordinarily not making an operative offer. Instead, the auctioneer is asking for offers to be made to him; and the bids made in response thereto are offers that can be revoked by the bidders prior to acceptance by the auctioneer. Consequently, this procedure creates no power of acceptance in the bidder. See, *Corbin on Contracts,* § 108.

Section 28 of *Second Restatement of Contracts* states, in part:

> "At an auction, unless a contrary intention is manifested, (a) the auctioneer invites offers from successive bidders which he may accept or reject."

16. The evidence adduced at trial was uncontroverted that the auction was "with reserve." At the outset of the November 21, 1980, auction, Harry Engelson announced:

> "The items that are liens cannot be delivered until we get approval, obviously, by the secured party . . ."

17. Additionally, *California Commercial Code,* § 2328(3), states:

> "Such a sale is with reserve unless the goods are in explicit terms put up without reserve. In an auction with reserve, the auctioneer may withdraw the goods at any time until he announces completion of the sale . . ."

18. This Court is satisfied that the property involved in the November 21, 1980, auction was clearly not offered "without reserve." The remaining question is whether the reserve conditions were met and whether the sale was completed.

19. Plaintiff concedes that the auctioneer's fall of the hammer alone did not complete the sale to plaintiff. However, plaintiff alleges that the condition necessary to bind the sale was the approval of the secured lender, Lloyds Bank. Plaintiff further alleges that the sale was complete at the time of confirmation by Lloyds Bank; consequently, at that moment a contract existed. Additionally, plaintiff contends that Hamilton had assigned all of its rights as a secured party to Lloyds; hence, Hamilton's consent to the terms of the sale was not required.

20. However, this Court is not persuaded by the plaintiff's logic. The evidence is uncontroverted that Lloyds consented to the sale at the auction, but Hamilton did not. The evidence advanced at trial indicated only that Hamilton was not represented by any party or agent at the November 21, 1980, sale. No consent to the sale was obtained from the trustee for Hamilton. Absent the consent of both Lloyds Bank and Hamilton, the reserve condition was never met and the sale could not be completed by the auctioneer.

21. The plaintiff fails to recognize the trustee's rights which vested by operation of law upon the filing of Hamilton's petition in bankruptcy on November 14, 1980. The trustee, Robert H. Stopher, succeeded to all the debtor's rights under the master agreement for non-recourse assignment of leases. Subject to permission from the Hamilton Court, Stopher acquired the option to permit a sale to occur or to cure past defaults. Stopher retained a residual interest in any surplus generated by the sale. Without the trustee's consent, a binding contract could not be made with the plaintiff.

22. *In Re Dulman v. Martin Fein & Co., Inc,* 25 UCC Reporting Service, 431, 431–32, a New York Supreme Court addressed the issue of the completion of an auction sale by the fall of the auctioneer's hammer. The Court noted that in the sale of an assignee's security interest the auctioneer may condition the sale subject to the confirmation of

**344**

the assignee without violating UCC, § 2–328(2).

23. Although UCC § 2–328(2) provides, in part that, "... a sale by auction is completed when the auctioneer so announces, by the fall of the hammer, or in other customary manners," such a narrow interpretation is not controlling. The Uniform Commercial Code mandates a broad reading of Subsection (2) of § 2–328. The Code is not designed to fetter businessmen with artificial formalities, but to encourage expansion of commercial practices. The inclusion of the condition was a fair and reasonable term not precluded by § 2–328.

24. The instant case dealt also with a conditional sale by the auctioneer Engelson, subject to the approval of the secured lenders, Lloyds and Hamilton. The Court does not interpret these conditions as unreasonable or violative of California Commercial Code § 2–328.

25. In *Dona Sly and Bobby Jones v. First National Bank of Scottsboro,* 387 So.2d 198 (Ala.1980), the Alabama Supreme Court held that in a public sale, subject to bank approval, the bidder may not impose a contract on the seller. The Court stated, in part:

"Because under § 7–2–328(3), plaintiff's bid was an offer, defendant was free to accept or reject plaintiff's bid. No contract existed until defendant accepted and at no time did the bank accept Dona Sly's bid. There is no breach of contract unless there was previously an offer and acceptance."

26. In *Eugene Stud & Veneer, Inc. v. State Board of Forestry,* 3 Or.App. 20, 469 P.2d 635 (1970), *pet. for reh. denied,* the Court stated, in part:

"Furthermore, where a right is reserved in the seller to reject any and all bids received, the right may be exercised by the owner even after the auctioneer has accepted a bid ... "

Engelson's affirmation or acknowledgement of plaintiff's high bid was ineffective to confirm the sale in light of an absence of consent from the Hamilton Court.

27. The second major issue of dispute concerned the effect the Hamilton bankruptcy had upon the auction sale and whether the auction violated the automatic stay provisions of 11 U.S.C. § 362. The Hamilton filing clearly triggers § 362 of the Code as to "property of the estate." The only question remaining is whether the 12 pockets are "property of the estate" subject to the automatic stay provisions of § 362(a). "Property of the estate" under § 541(a) includes:

"Such estate is comprised of all the following property, wherever located: (1) ... All legal or equitable interests of the debtor in property as of the commencement of the case."

28. This Court is convinced that Hamilton Equipment Leasing Corporation, as lessor, maintained an interest in the pockets, as defined by § 541(a) of the Code. Evidence adduced at the trial indicated that Hamilton maintained a residual interest in the property subject to the master agreement for non-recourse assignment of leases. Stopher, the trustee for Hamilton, retained the option to permit a sale of the pockets or to cure any past default. Should a sale be permitted, any surplus generated would inure to the benefit of the Hamilton trustee. Such an interest would become property of the estate and fall within the confines of § 362.

29. The law as promulgated in *In Re Parker GMC Truck Sales, Inc.,* 12 B.R. 667 (Bkrtcy.Ind.1980), has largely been eroded in *United States v. Whiting,* —— U.S. ——, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). In *Parker,* the Court denied the trustee's request for turnover of property that had been seized by the IRS pursuant to a tax lien and ruled that the seized property did not become part of the estate; only the rights of the debtor in the collateral would become part of the estate.

30. In *Whiting,* the Court notes that Section 541(a)(1) speaks in terms of the debtor's interests in property rather than property in which the debtor had an interest.

"Although these statutes could be read to limit the estate to those 'interests of the debtor in property' at the time of the filing of the petition, we view this as a definition of what is included in the estate rather than as a limitation."

Clearly, the pockets were part of the estate as envisioned under Section 541(a). The legislative history suggests that any attempt to restrict the scope of Section 541(a)(1) would frustrate the rehabilitation effort of the debtor. *Whiting* solidifies the position of the Hamilton trustee in respect to the "pockets." Any legal or equitable interest that resided in the "pockets" vested in the Hamilton trustee pursuant to Section 541(a) and Section 542(a) of the Bankruptcy Code.

31. The plaintiff has requested a total of $500,000 in his prayer for punitive damages arising out of his Second and Third Causes of Action. However, no showing of malice by any of the defendants towards the plaintiff has been established in any of the claims.

32. For the foregoing reasons, plaintiff's First Amended Complaint for breach of contract, warranty, interference with a prospective advantage, and interference with a contractual relationship should be denied in all respects.

The foregoing shall constitute findings of facts and conclusions of law within the purview of Rule 52(a) of the Federal Rules of Civil Procedure, and Rule 752(a) of the Rules of Bankruptcy Procedure.

If either party desires different or additional Findings of Fact and Conclusions of Law, same shall be submitted within ten (10) days from this date. Thereafter, attorney for the defendants will submit a proposed Judgment.